1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10   DANIEL THOMAS,                         1:11-CV-01037 LJO GSA HC

11                    Petitioner,           FINDINGS AND RECOMMENDATION
                                            REGARDING PETITION FOR WRIT OF
12          v.                              HABEAS CORPUS

13   GREG LEWIS, Warden,

14                    Respondent.

15   _____/

16
17          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

     to 28 U.S.C. § 2254.  He is represented in this action by Charles M. Bonneau, Jr., Esq.
18
                                          **BACKGROUND**
19
            Petitioner is currently in the custody of the California Department of Corrections pursuant
20
     to a judgment of the Superior Court of California, County of Tulare, following his conviction by
21
     jury trial on December 17, 2007, of murder in the first degree (Cal. Penal Code § 187).  (CT[1]
22
     1271.)  Special allegations that Petitioner personally used a firearm (Cal. Penal Code
23
     § 12022.53(d)) and that Petitioner committed the crime for the benefit of, at the direction of, or in
24
     association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)) were found to be true.
25
     (CT 1271.)  On April 2, 2008, Petitioner was sentenced to serve an aggregate indeterminate term
26
     of fifty years to life in state prison. (CT 1394, 1397.)
27

28          _____
                [1]"CT" refers to the Clerk's Transcript on Appeal.

                                                  1

Petitioner filed a timely notice of appeal.  On February 5, 2010, the California Court of

Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

decision. (See Lodged Doc. No. 4.)  Petitioner filed a petition for review in the California

Supreme Court.  (See Lodged Doc. No. 5.)  On April 14, 2010, the California Supreme Court

summarily denied the petition.  (See Lodged Doc. No. 6.)

On June 21, 2011, Petitioner filed the instant federal habeas petition, presenting the

following three claims for relief: 1) "Petitioner was denied due process by the refusal of the

request to bifurcate the gang allegations, because it resulted in the introduction of constitutionally

irrelevant evidence in the guilt phase trial"; 2) "Petitioner was denied the right to equal protection

by the use of a peremptory challenge to remove a Hispanic prospective juror for pretextual reason

based on her opinion about the threat of gang violence"; and 3) "Petitioner was denied due

process by a burden shifting instruction on mutual combat, eliminating the right to self defense in

a case involving no prior agreement to fight."  On September 26, 2011, Respondent filed an

answer to the petition.  On October 19, 2011, Petitioner filed a traverse.

## STATEMENT OF FACTS[2]

[Petitioner] Daniel Thomas stands convicted, following a jury trial, of first degree murder in which he personally and intentionally discharged a firearm, causing death, and which was committed for the benefit of or in association with a criminal street gang. (Pen.Code,[FN1] §§ 186.22, subd. (b)(1), 187, subd. (a), 12022.53, subd. (d).) [FN2] His motion for a new trial was denied, and he was sentenced to a total unstayed term of 50 years to life in prison. He now appeals. For the reasons that follow, we will affirm.

FN1. All statutory references are to the Penal Code unless otherwise stated.

FN2. Ismael Sauceda was jointly charged with [Petitioner]. He subsequently entered into an agreement with the district attorney's office whereby, in return for his cooperation and testimony, the murder charge would be dismissed, he would plead guilty to being an accessory (§ 32) and admit the gang allegation (§ 186.22, subd. (b)), and he would receive a suspended five-year prison sentence.

### FACTS

### Prosecution Evidence

*The Shooting and Aftermath*

[2] The Fifth DCA's summary of the facts in its February 5, 2010, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

Early on the morning of January 14, 2006, Joseph Acosta and his friend, Rick Campbell, drove to the Acapulco Club in Sultana. When they drove up in a black pickup, [Petitioner] and Ismael Sauceda were in the parking lot, talking to two females. It was about closing time. Acosta greeted Sauceda and [Petitioner], with whom he was acquainted.

No more than half an hour after Acosta and Campbell arrived, a group of four or five men walked out of the bar. They were inebriated and staggering. They were quiet, not laughing or talking to each other.

[Petitioner] approached Salvador Chavez, who was wearing a blue baseball hat and was the first to exit the bar, and asked in English if he was a "scrapa," a derogatory term for Sureno.[FN3] Chavez responded in Spanish that he was nothing and did not want any problems. The other men with him also said they did not want any problems. They seemed scared. The confrontation began to move from the door to near Rick Campbell's truck, as one of the trucks belonging to Chavez and his group was there. [Petitioner] was insisting Chavez was a scrapa, and was using gang-affiliated words, such as "scrapa" and "Sureno" (the enemies of the Nortenos), to call Chavez out. Chavez walked around [Petitioner], and the men with him followed. They were trying to leave. The whole time they were walking, they were saying in Spanish that they did not want any problems. Chavez also said, in Spanish, that he did not "bang." Neither Chavez nor anyone in his group made any threats. When they walked around him, [Petitioner] got back in front of them. Sauceda went over as if to back up [Petitioner].[FN4] Acosta told [Petitioner] to leave Chavez alone, and that the men did not want any problems. [Petitioner] said, "'Fuck that. This is Norte. Sulta," then pulled a gun from his waistband and shot Chavez three or four times. [Petitioner] and Chavez were face to face, about two feet apart. [Petitioner] was wearing a red beanie with an "N" on it. Based on Acosta's experience with Nortenos, this meant Norte and was something worn around Sultana to show one's colors. Chavez walked a couple of feet around a car that was in the lot, then fell to the ground. [Petitioner] and Sauceda fled.

FN3. Acosta had been a Norteno gang member since he was in junior high school, but had dropped out about two years before trial.

FN4. Acosta told Detective Fernandez after the incident that it was Sauceda who was making the comments to Chavez and his friends, yelling "Norte this, Norte that," but Acosta could not remember, as of trial, what Sauceda said. [Petitioner] was also making comments. Acosta also did not remember Chavez arguing back at [Petitioner] or any pushing, although he testified at the preliminary hearing that there was pushing and arguing before the gun was pulled.

Sauceda's version of events was somewhat different than Acosta's version. He and [Petitioner] had been friends since elementary school. They got together at some point on Friday, January 13, 2006. Late that evening, they met up with another friend, Ivan, and a 16-year-old whose name Sauceda could not recall and whom he did not know well, by Sauceda's house in Sultana. Their purpose that night was simply to be together and have a good time. They were not looking for trouble. They walked around for a while, then ended up by the Redwood Inn, where they ate some tacos. From there, they went to the Acapulco Club, a bar just up the street from the Redwood Inn. They did not go into the bar due to their age, but instead hung around outside the door, which was propped open. They could see inside and made eye contact with two women named Felisia and Rosalinda, who came outside and began talking with them.

The two women went back inside after about five minutes, drank some more beers, and danced. At some point, Ivan left to go home, and Acosta and Rick Campbell

3

arrived. Felisia and Rosalinda came out and went back inside a couple more times.

At 2:00 a.m., people came out of the bar, as it was closing time. Sauceda, who was standing by a truck, got into an argument with a man who gave him a weird, "evil" look.[FN5] Sauceda thought the man might be a Sureno, although he was not dressed like one. A Sureno would have known Sauceda was a Norteno by the way he was dressed that night. Sauceda began saying gang-related stuff. He did not recall whether he asked if the man was a scrapa, but he said something about Norte, and the man said some things back. The man said, in Spanish, that people from Sultana "ain't nothing." Sauceda thought they were going to fight, but the two women pulled him back.

FN5. Sauceda was not sure whether this man came out of the bar with the man who got shot. Felisia and Rosalinda were outside and near Sauceda at the time of the argument. Sauceda was not sure, but he believed the 16-year-old was also nearby.

Meanwhile, [Petitioner] was arguing with a group of at least five men by the entrance to the bar. Sauceda-who did not see what precipitated the argument-heard more than one voice yelling. He did not know whether one of the voices belonged to [Petitioner]; he did not hear [Petitioner] yell "Norte" or "Sulta Boys." The person [Petitioner] was arguing with was saying that he did not want any problems. Acosta started telling [Petitioner] to let it go, that the man was a "pisa"-someone from Mexico, most likely a farmworker-who did not "claim." Speaking both to [Petitioner] and to Sauceda, Acosta said it was not worth it. Sauceda did not see anyone with weapons, and no one charged at him with a baseball bat. Sauceda was not really watching [Petitioner]; instead, he was "in [his] own scene."

As the women were pulling Sauceda back, he heard gunshots. He ran home. [Petitioner] and the 16-year-old also ran. When Sauceda reached his house, he saw [Petitioner] standing by [Petitioner]'s car, which had been left earlier that evening across the street by Ivan's house. [Petitioner] asked if he could go inside with Sauceda. The 16-year-old also went inside with them. They went into Sauceda's room, where they stayed with the lights off. [Petitioner] told Sauceda not to turn on the lights. It was also Sauceda's idea to leave the lights off; there was a police helicopter, with its searchlight, overhead. [Petitioner] said he had messed up. He also said he was not feeling well, so Sauceda got him a drink of water. [Petitioner] lay down on a mattress on the floor. There was a little light from outside, and Sauceda saw [Petitioner] lift up the mattress. [Petitioner] appeared to put something underneath it, but Sauceda was not sure what was going on. Eventually, they all went to sleep.

A few hours later, when it was starting to get light out, there was knocking on the door.[FN6] [Petitioner] said there were cops outside. He tried to hand Sauceda a beanie with a heavy object wrapped inside. From the weight, Sauceda assumed it was the gun. [Petitioner] told Sauceda to stash it, but Sauceda tossed it back to him. The police said they wanted to talk to Sauceda, so he went out to them. When they asked if there was anybody else in the house, Sauceda's mother said yes, and so [Petitioner] also came out.

FN6. The 16-year-old left sometime before this.

Tulare County Sheriff's Detective Fernandez interviewed Sauceda and [Petitioner] later that day. [Petitioner] denied being involved in any shooting. He said they heard the shooting when they were eating burritos at a taco truck at the Redwood Inn, so they took off running so they would not get hit. [Petitioner] denied being at the bar where the shooting occurred.

4

A search warrant was executed at Sauceda's apartment. Inside the bedroom used by Sauceda, officers found some gang paraphernalia. They also found a red beanie with a white N on it. Inside the beanie was a .25-caliber semiautomatic handgun with three live rounds in the magazine and a live round in the chamber. Subsequent tests showed the four spent shell casings found at the scene of the shooting were fired from that gun.

An autopsy showed that Salvador Chavez suffered four gunshot wounds, three to the left chest and one to the left index finger. The three chest wounds were all entrance wounds, and two produced through-and-through wounds to the heart. The cause of death was exsanguination due to multiple gunshot wounds to the chest, with Chavez bleeding to death within minutes. The bullets recovered from his body were consistent with having been fired from the gun found in the beanie in Sauceda's room. Chavez had a blood-alcohol level of 0.28 percent.

A bag containing live ammunition was found during execution of a search warrant on a trailer on the property of Hope Pizana, [Petitioner]'s grandmother, whose address [Petitioner] gave as his when he was booked. The information Fernandez had was that when [Petitioner] stayed with Pizana, he stayed in her house and not in the mobile home in back. Gang graffiti was found on various buildings on the property.

*The Gang Evidence*

According to Sauceda, the Sulta Boys are just a group of friends from the same place. A Norteno is a gangster. The Sulta Boys have no connection with Nortenos, and are not a gang. They do not associate with other groups, but simply keep to themselves. They have no leader, and there is no special initiation to go through to become a Sulta Boy. There are perhaps seven or eight in the group; all are just people who live in the Sultana area. They hang around the neighborhood and talk, drink beer, and play basketball. Sauceda was not aware of the Sulta Boys committing any crimes. He never saw any of them with any kind of weapon.

Sauceda admitted telling Herman Martinez, an investigator for the district attorney's office, that Sulta Boys is a Norteno group and a subset of Nortenos. Basically everyone in Sultana who claims to be a gang member is Norteno. There are not a lot of Surenos in Sultana, and claiming to be Sureno in that area would not be a good idea. Sauceda considered himself a member of the Sulta Boys in January 2006; sometimes [Petitioner] was present when Sauceda hung out with the group. Sauceda did not recall whether [Petitioner] ever claimed to be a Sulta Boy or whether he ever claimed Norteno. Sauceda told Martinez, however, that [Petitioner] was a Sulta Boy, an associate just like Sauceda. [Petitioner] was wearing Sauceda's red beanie with the white N at the time of the shooting, because it was a cold night. The two had cut their hair so short that morning that they were almost bald, and when they got to the Acapulco, [Petitioner] said he was cold and asked for something to cover his head. Sauceda had the beanie in his pocket. The beanie-which was a Nebraska Cornhuskers hat that Sauceda had purchased at a sports store-was the only one Sauceda had. Sauceda liked the hat because of the N, which helped him identify as Norteno. He also had a burgundy beanie with a 49'ers emblem on it, which he was wearing that night along with a red jacket.

The search of Sauceda's residence following the shooting turned up his binder and what Sauceda termed gang-related graffiti, some of which was done by a friend. The binder had on it a Huelga bird, which to Sauceda meant Norte. It was a symbol the Nortenos used. In addition to the beanie [Petitioner] had worn, Sauceda had a belt buckle with N on it and some red shoe laces. He had the items because of his affinity toward Nortenos. Sauceda also knew that the number 14 had a special meaning for Nortenos, because N was the 14th letter of the alphabet. X4 stood for Nortenos. Nortenos do not

like Surenos, who associate with the color blue and number 13. Sauceda's nickname was "Pee Wee"; [Petitioner]'s nickname was "Nappy." Sauceda was nicknamed "Pee Wee" when he was a baby.

Tulare County Sheriff's Detective Hamlin testified as an expert on gangs. According to Hamlin, the two dominant gangs in Tulare County are northern (Norteno) criminal street gangs and southern (Sureno) criminal street gangs. The two are rivals.

Nuestra Familia is the primary northern gang in the California prison system; they are the shot callers for all northern gangs in California. People getting out of prison and returning to their communities will often bring orders from the shot callers in Nuestra Familia to the streets. Those getting out of jail, who have had to adhere to rules set forth by Nuestra Familia while in custody, will take the rules back to the streets. For instance, if there is someone they no longer want in their gang, they have to go through the chain of command to a shot caller to receive an okay to assault or kill the gang member. Also, if there are drug ties in a certain area, that money can be filtered back into the shot callers in prison.

Hamlin had heard of Sulta Boys, which, from his experience, was a northern gang that claimed the community of Sultana as its turf. Hamlin had talked to approximately five members of Sulta Boys, had read police reports involving and talked to other police officers concerning the group, and had seen graffiti associated with it, primarily in Sultana.

Nuestra Familia, Norteno, and Sulta Boys are all basically under the same umbrella. They all have alliance to the north. When street cliques such as Sulta Boys go into the prison system, the cliques no longer exist. They are now considered under the Norteno umbrella. Nuestra Familia is the top level. The Nortenos fall under that. They are not necessarily members of Nuestra Familia, but they are run by Nuestra Familia. Nortenos are essentially the general gang. Then there are the subcliques like Sulta Boys, Brown Pride Catella, North Side Dina, and other local community Norteno gangs. Within the Nortenos there are different levels of gang membership. The criminal street gangs often will have a shot caller-frequently someone who is older than the rest or has committed more violent crimes or a lot of crimes for the gang-and underneath that level is the general membership. These members sometimes refer to themselves as soldiers, as they are willing to go out and do work for the gang. Underneath that level are the associates who just hang out with the gang, but are not around when the crimes are committed. If someone wants to move up in the gang, he needs to be willing to commit crimes and do work for the gang-crimes of opportunity or against a rival gang-to gain notoriety for the gang and the gang member himself. Such crimes help the gang by what gang members believe is a type of respect, but it is actually fear instilled in the public or in rival gangs. That benefits the gang because people do not want to come forward and testify about gang crimes, and it keeps rival gang members out of the gang's area. However, someone does not necessarily have to commit crimes to become a member of a gang. Some people have said they are considered a member just by growing up in a certain area or having an older family member in a gang. "Jumping in"-being beaten by gang members for a certain length of time-used to be a common way of becoming a gang member in Tulare County. As gang crimes have carried stiffer penalties, however, gangs have had a harder time finding members. Now, many gangs allow people to become members by hanging around long enough or by committing a crime to show they are "down" for the gang.

To the extent it has any organizational structure, Sulta Boys is a very loose organization. This is typical of Tulare County street gangs, which might have one person who is considered a shot caller and the rest falling underneath him, or which may not

6

have anybody who is a shot caller per se. To Hamlin's knowledge, Sulta Boys do not have any shot caller. They are, however, a northern-affiliated gang that has been in the area since the late 1990's. From past contacts, Hamlin estimated that 25 to 40 people are in Sulta Boys.

Nortenos associate with the color red and number 14, for the letter N, which is the 14th letter of the alphabet and is related to Nuestra Familia. Roman numeral 14, X4, and four dots are also associated with the group. Surenos associate with the color blue and number 13, for the letter M, which is the 13th letter of the alphabet and is related to Le Eme. That is the prison gang for all Southerners.

Hamlin estimated that there are approximately 2,500 northern gang members in Tulare County. He personally investigated one crime in which Sulta Boys members were involved. He had investigated 300 to 400 in which Nortenos were involved. Norteno gangs primarily commit crimes of assault on all different levels, including simple battery, assaults with deadly weapons, shooting at inhabited dwellings, attempted murder, and murder. He was familiar with a shooting that took place in Sultana on February 13, 2004. In that case, the suspects confronted the victim, whom they believed to be a southern gang member. The suspects yelled out derogatory terms for Southerners, then shot at the victim with a shotgun and struck him in the face. Juan (Johnny) Alvarez was convicted of assault with a deadly weapon as a result of the shooting. As far as Hamlin knew, Alvarez belonged to Sulta Boys. However, Hamlin did not locate any connection between him and [Petitioner].

Hamlin was also familiar with two shootings that took place in Cutler and Orosi on May 22, 2004. In the first shooting, the suspect fired at a residence when there were people inside. One of the family members who lived there was believed to be a southern gang member. In the other shooting, the victim, who was in a wheelchair, was wearing blue clothing and had a blue bandanna tied to his wheelchair. He was a member of OGS (Original Gangster Surenos), who claim Orosi as their turf. The suspect shot him. Daniel Mendoza was convicted of assault with a deadly weapon as a result of the shootings. Mendoza was a member of the northern gang Brown Pride Catella, which was out of Cutler-Orosi. Hamlin did not find any connection between him and [Petitioner].

Hamlin spoke to other officers about [Petitioner], read all of the reports in this case, and researched [Petitioner]'s one prior contact with law enforcement. He also interviewed [Petitioner] himself, just after Fernandez and other detectives interviewed [Petitioner] in connection with this case. In that interview, [Petitioner] related that he was 18 years old, and that he was born and raised in Sultana. Although he moved from town to town, he considered himself as having lived there basically his entire life. He hung out with the guys who lived in Sultana. He was born into being a Northerner. It was just something he was born into. He hung out with "[a]ll the home boys" from Sultana, but not with anybody else from other cities. He had no problem with Northerners from other cities, however. Sulta Boys were just neighborhood kids, but a person had to be born and raised in Sultana to belong. People who moved to Sultana were not allowed to be in the Sulta Boys. [Petitioner] did not know how many individuals were in Sulta Boys, but believed there were "a good few," but less than 25. They all "back[ed] up Norte ." [Petitioner] admitted having "only God can judge me" tattooed on one hand, a cross on his arm, and "Sultana" on his other arm. Although Hamlin found no tattoos of a 14, X4, four dots, or anything that said "Norteno" or "Norte," he considered the "Sultana" tattoo to be gang-related because, while it is uncommon for people to get the name of a neighborhood tattooed on their bodies, it is very common with gang members. [Petitioner] had been booked into jail for driving under the influence when he was 18, and he told them he was a Northerner to make sure they did not put him in with Southerners.

Hamlin examined the notebook that was seized from Sauceda's residence. There were several items of gang-related writing, such as "Sulta," references to northern gangs, and monikers. One of the drawings contained 93666-the zip code for Sultana-with the three crossed out. This is often done by northern gang members to disrespect the number three because of its connection to southern gang members. Threes and S's are often crossed out. "Sulta Boys" was written in the notebook, and there was a drawing of a Huelga bird. A Huelga bird-the symbol of the United Farm Workers-is associated with Northerners. Among other items in the binder was a list of monikers, including "Nappy." The list was something Sulta Boys would write as a type of roll call. With respect to the red hat with the letter N, wearing it would show everyone else in the gang culture "who you back-up. What you're down for." The red belt, belt buckle with the letter N, and red shoe laces found at Sauceda's residence were all northern gang-associated attire.)!

Hamlin also examined photographs taken of the graffiti on the sheds and other buildings on Hope Pizana's property. The graffiti included a Huelga bird, above which was spray-painted "Danny." There were also other northern references, including derogatory terms for southerners and obscenities directed at them. There were names that may have been monikers; X4, which is a way of writing the number 14; and the number 559, which is the area code they claim as their turf. With respect to the contents of one of the rooms inside the mobile home on the property, Hamlin was struck by the absence of the color blue. There was a black tennis shoe with a red sole and red accent on the side, which would be common attire for a Norteno. The words "Sultana" and "Sulta," sometimes with the S crossed out, were written at several places.

Based on all of the information available to him, including his interview with [Petitioner], Hamlin opined that [Petitioner] was a northern gang member of the Sulta Boys subclique. The key factors were [Petitioner]'s knowledge of the Sulta Boys and admission of being a Northerner in the interview; the attire he was wearing when the crime was committed, specifically the amount of red; the comments made back and forth between him and the victim; and the graffiti located at his residence. Hamlin further opined that the shooting of Salvador Chavez would benefit and was in association with northern criminal street gangs. The crime was committed in a public area in the presence of a number of people. The words that were exchanged showed the gang affiliation, and the crime showed that [Petitioner] was willing to do work for the gang, and was not afraid to commit such a crime in such a public area. This would benefit his status within the gang, showing them he was willing to do work and giving him notoriety and status. It would also benefit the gang in that the victim was perceived to be possibly a rival southern gang member who was making derogatory remarks toward Northerners. It showed that northern gangs are to be feared and that Sultana is northern territory. Northerners would see it as gaining respect; it would instill fear in the public and in rival gang members.

***Defense Evidence***

*The Shooting and Aftermath*

On the night of the shooting, Felisia Perez and Rosalinda Garcia were at the Acapulco Bar. They arrived about an hour and a half before closing time. Sauceda, whom they knew, was there. He was standing outside of the bar, by the door. With him was [Petitioner], whom the women had not met before that evening.

Perez greeted Sauceda and went inside the bar to meet her boyfriend. Garcia initially went inside, but was in and out, talking with [Petitioner] and Sauceda by the door. Inside the bar, in addition to Perez, her boyfriend, and the bar's staff, were four or five unknown Mexican males. Near closing time, Perez came back outside and joined

Garcia, Sauceda, and [Petitioner], who were by a vehicle near the front door. Among the other vehicles in the lot was a black truck, in which some men had arrived about an hour after the women. Perez never saw the men go inside the bar.

When the bar was closing and people were coming out, Perez and Garcia were already outside, talking with Sauceda and [Petitioner]. According to Perez, an argument started between [Petitioner], Sauceda, and the four or five Mexican men who had been inside the bar. Those men, who appeared to be intoxicated, came outside and were "starting stuff." Chavez walked out of the bar and started pushing [Petitioner] for no reason.[FN7] An argument started. Perez heard some of it. It was about the colors red and blue, which she knew were gang colors. The Mexican men were saying they liked blue, and then [Petitioner] and Sauceda argued back. [Petitioner] used the term "Norte" and told Chavez he was a Norteno.[FN8] Chavez, who was speaking Spanish, said "'Sur trece'" and started pushing [Petitioner]. Chavez's companions were right behind him, and Perez, Garcia, Sauceda, and [Petitioner] were surrounded by them.

FN7. Perez did not know Chavez, but identified the man who was pushing [Petitioner] as the person who ultimately was shot. She previously told the district attorney's investigator that she did not remember who started the argument, but that it could have been Sauceda and [Petitioner]. She was somewhat intoxicated that night and had trouble remembering.

FN8. Perez previously told the defense investigator that [Petitioner] had a red handkerchief half in and half out of his back pocket.

The group of men were associated with a white Mustang and a green truck. At one point, one of the group went to the green truck and grabbed a metal baseball bat, saying he was going to "fuck [Sauceda] up." He then walked toward Perez and Sauceda and swung the bat one time. Sauceda ducked and pushed Perez, then the man stood in front of Sauceda, holding the bat down with both hands.[FN9] He and Sauceda were arguing the whole time. When he swung the bat, Sauceda backed down and actually stepped away.

FN9. Perez told the district attorney's investigator that the man did not do anything with the bat as he was walking up; that was when Chavez got shot and everybody took off running.

The man with the bat was off to [Petitioner]'s side. Chavez and the others in Chavez's group were still in front of him. [Petitioner] was by the black truck. Perez saw [Petitioner] get pushed hard four or five times; he stumbled toward Garcia, who was standing near him and to the side, but did not fall. Perez did not believe Chavez had anything in his hands, but at some point she heard him say he was going to "kick somebody's ass." While this was going on, the men associated with the black truck were sitting inside that truck. Neither of them got out before the shooting. At no time while the dispute was occurring did Perez see either of them say anything to Sauceda.

Perez was looking toward Sauceda, and so did not see any of the shots fired. She heard them, though, and then saw Chavez take a step back and fall. Everyone ran. Perez and Garcia got in their vehicle and left. When they left, police were at the scene. Perez saw the occupants of the black truck outside of their vehicle, talking to the police.

Garcia's recollection was somewhat different. According to her, she and Perez arrived no more than 10 to 20 minutes before the bar closed. Sauceda was alone when they got there. [Petitioner] walked up from the taco truck by the Redwood Inn while Garcia was greeting Sauceda the first time she came out of the bar. [Petitioner] was with someone, but the other man left before long. [Petitioner] then started talking to Garcia.

9

Garcia, Perez, Sauceda, and [Petitioner] were standing outside, talking, when people started leaving the bar because it was closing. Two men came out and walked toward a green truck, then Chavez and his group, all of whom were drunk, exited a few seconds later and headed for a white sports car. Garcia and her companions were still talking together, then they heard Chavez's group arguing with the two men in the green truck. Chavez's group approached the other men, and a fight appeared imminent. Sauceda went over and tried to stop them. [Petitioner] was still talking to Garcia and Perez, but then the men in Chavez's group started surrounding Sauceda and [Petitioner] went over to defend him. [Petitioner] was telling them not to fight and trying to get Sauceda to leave. Three of the men then focused on [Petitioner] and started in with him. Chavez started pushing [Petitioner] and telling him "'sur trece,'" which Garcia understood to mean that he was a Sureno or Southerner. [Petitioner] said it was not even about that, but Chavez just kept on. Garcia never heard [Petitioner] utter any gang slurs.

Perez pulled Sauceda by the arm. He made a movement to try to get her to leave him alone, but then Garcia grabbed his arm and told him to come on and go, that it was not worth it. Sauceda and [Petitioner] were about five to seven feet apart at this point. Garcia also told [Petitioner] to let it go, that it was not worth it, but Chavez pushed [Petitioner] three times, harder each time. The third time, both [Petitioner] and Garcia, who was holding on to him, stumbled back. Chavez appeared angry and frustrated. He was pushing [Petitioner] and egging him on. He was drunk and wanted to fight with somebody.

Before the fight started, two men pulled up in a black truck. Sauceda said it was his friend, and he went over to talk to them and then introduced [Petitioner], Perez, and Garcia to them. After the fight started and Chavez's group was confronting [Petitioner], the driver of the truck stood outside the vehicle, holding a metal bat with a black handle. He was approximately three feet to the side of and slightly behind [Petitioner], and would have been visible to [Petitioner] from the corner of his eye. He did not swing the bat or say anything, but just stood there, watching.

When Chavez pushed [Petitioner] for the final time, Chavez's friends were nearby and it appeared that they were moving toward [Petitioner], too. The two main ones were "right in his face." After the second push, the man in the black truck came out with the bat. At the third push, when Garcia was trying to get [Petitioner] to leave it alone, [Petitioner] looked at her and said, "'Just wait.'" He pushed her to the side, as she was standing kind of in front of him, and she saw [Petitioner] shoot Chavez. She did not see him pull out the gun, but she saw fire come from it. The shots were fired within a matter of seconds after the third push. At the time they were fired, Chavez was in front of [Petitioner], perhaps two to three feet away, and backing up. He moved six to seven feet after the gunshots, then his body just fell flat.

*The Gang Evidence*

Hope Pizana, [Petitioner]'s grandmother, owned a two-acre ranch near Sultana that was searched in connection with this case. [Petitioner] did not live at her house, but sometimes stayed overnight with her. Her house was at the front of the property. All of the graffiti was on her next-door neighbor's property, not hers.

Dr. Lewis Yablonsky, an emeritus professor of criminology and sociology at California State University, Northridge, testified as an expert on gangs. In connection with this case, he reviewed police reports, the preliminary hearing transcript, and other information, and interviewed [Petitioner].

According to Yablonksy, there are three categories of active gangsters. First are

10

the so-called OG's-the Original Gangsters or, as they are known in Hispanic gangs, Veteranos. These are individuals who are heavily involved in gang activity and usually have fairly long records. They develop a reputation for violence and crime. They are the leaders or shot callers. Second are those referred to on the streets as G's. They are the soldiers or followers. They participate in gang activity and crime. Third are the so-called wannabes. These are usually younger individuals. They are like interns trying to develop status in the gang, and have to put in work. Work involves violence and criminal activities-something that enhances the gang's reputation. A wannabe ultimately wants to be initiated into the gang or acknowledged as a gang member, although the process takes different forms with different gangs. Often, if an individual has an older family member in a gang, he does not necessarily go through the process because he is assumed to be part of the gang.

Yablonsky had also identified three categories of nonactive gangsters. First are the "gangsta" groupies. These are youngsters who like hip hop music, dress like gang members, admire the "gangsta," and are in the wrong place at the wrong time or are present with real gang members and so end up as codefendants in gang crimes, but are not really active gangsters. Second are residents in gang neighborhoods. In certain heavily influenced gang neighborhoods, certain individuals are almost automatically considered part of a gang in the sense that they are sort of adopted. They may not be committing crimes, but they become identified because they are residents in a gang neighborhood. Sultana is an example; it is primarily a northern area, and there are no Surenos in the area. This factor may come into play during classification in a jail: If someone is from a neighborhood known as being heavily Norteno or Sureno, for example, a person identified as being from that area will be identified as being a gang member. Third are former gang members. Some people "wake up" and decide they do not want to do this anymore, so they start doing other things and get out of the gang. Dropouts fall within this category.

Yablonsky's research showed a definite difference, in terms of the degree of cohesion, organization, and structure, between prison gangs and street gangs. The gangs in the communities are much looser in terms of organization and structure. In his view, there is no real Norteno or Sureno organization except in prison. On the streets, young people will use the Sureno or Norteno identification as a type of defense mechanism, while having no actual gang affiliation. Similarly, some individuals being booked into jail or going to prison will take on some sort of identification for self-protection.

Yablonsky did not see the shooting in this case as a gang-related act of violence. Instead, he saw it as a conflict that took place late at night or early morning, and that did not have the three major criteria of the gang law, viz., was it directed by the gang, did it enhance the gang's reputation, or was it in association with another gang individual. Yablonsky also did not see [Petitioner] as a gang member. Instead, he placed [Petitioner] in the category of living in a gang area and probably associating with certain gang individuals. To Yablonsky, the most significant factor that caused him to conclude [Petitioner] was not a gang member was the fact [Petitioner] had no prior record of gang violence or any type of rap sheet.

(See Lodged Doc. No. 4.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Tulare County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lockyer v. Andrade,  538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent

1  judgment that the relevant state court decision applied clearly established federal law erroneously

2  or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

3  538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

4  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

5  Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

6  correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If

7  the Court determines that the state court decision is objectively unreasonable, and the error is not

8  structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

9  effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

10       Petitioner has the burden of establishing that the decision of the state court is contrary to

11  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

12  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

13  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

14  state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

15  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

16       AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

17  is limited to the record that was before the state court that adjudicated the claim on the merits,"

18  and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

19  Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

20  courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

21  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

22  factual finding is not entitled to deference if the relevant state court record is unavailable for the

23  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

24  Tamayo-Reyes, 504 U.S. 1 (1992).

25  III.    Review of Claims

26          A.   Denial of Motion to Bifurcate Gang Enhancement

27       In his first ground for relief, Petitioner claims the trial court erred by denying his motion

28  to bifurcate the gang enhancement, because the refusal resulted in the introduction of

constitutionally irrelevant evidence in the guilt phase trial.  Petitioner presented this claim on

direct appeal to the Fifth DCA where it was rejected in a reasoned decision.  (See Lodged Doc.

No. 4.)  Petitioner then presented the claim to the California Supreme Court in a petition for

review.  The California Supreme Court denied the petition without comment.  (See Lodged Doc.

No. 6.)  When the California Supreme Court's opinion is summary in nature, the Court must

"look through" that decision to a court below that has issued a reasoned opinion.  Ylst v.

Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The Fifth DCA analyzed the claim as

follows:

A. *Refusal to Bifurcate Gang Enhancement Allegation*

The information alleged an enhancement allegation pursuant to section 186.22, subdivision (b), in that the murder "was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members." Prior to trial, defense counsel expressed concern about purportedly extensive publicity regarding the influence of criminal street gangs, unsuccessfully requesting first a continuance in an effort to abate the effects of the publicity, and then a change of venue. During the hearing on the parties' in limine motions, defense counsel orally requested bifurcation of the gang allegation, arguing in part that much of the gang expert's testimony would be prejudicial because it would have nothing to do with [Petitioner]. The prosecutor opposed the bifurcation request, arguing that evidence [Petitioner] was committing a crime in association with a gang was going to be presented because that was the motive in this case. The prosecutor asserted, "[T]he motive is the gang slurs. This won't happen without the gang and as long as that's going to come into evidence, the jury needs to know the relevance of it and in order to understand the relevance they're going to have to understand about the gangs." The trial court denied the request. [Petitioner] now says the trial court erred. We disagree.

In *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez* ), the California Supreme Court held that a trial court has discretion to bifurcate trial on a gang enhancement, but that "the trial court's discretion to deny bifurcation of a charged gang enhancement is ... broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (*Id.* at p. 1050.) The court cautioned that bifurcation will sometimes be appropriate: "The predicate offenses offered to establish a 'pattern of gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez*, at p. 1049.) On the other hand, "[e]vidence of the defendant's gang affiliation-including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like-can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.] [¶] Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself-for example, if some of it might be excluded under Evidence

Code section 352 as unduly prejudicial when no gang enhancement is charged-a court may still deny bifurcation." (*Hernandez*, at pp. 1049-1050.)

*Hernandez* concerned a robbery during which one of the defendants said the victim was dealing with "'Hawthorne Little Watts,'" which the victim suspected was a gang. (*Hernandez, supra*, 33 Cal.4th at p. 1045.) The high court found no abuse of discretion in the trial court's denial of bifurcation, noting: "Much of the gang evidence here was relevant to the charged offense. Indeed, defendant Hernandez himself injected his gang status into the crime. He identified himself as a gang member and attempted to use that status in demanding money from the victim.... Detective Goetz's expert testimony helped the jury understand the significance of Hernandez's announcement of his gang affiliation, which was relevant to motive and the use of fear." (*Id.* at pp. 1050-1051 .)

In the present case, gang enmity-or at least [Petitioner]'s perception of it-was the sole motive for an otherwise senseless killing, from the prosecution's standpoint. "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] '"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.)

Expert testimony on gangs, especially the Norteno-Sureno rivalry, helped the jury here understand the prosecution's theory of why the homicide occurred. "Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [[Petitioner]'s] actual guilt." (*Hernandez, supra,* 33 Cal.4th at p. 1051.) Accordingly, the trial court did not abuse its discretion by denying [Petitioner]'s request for bifurcation. Nor has [Petitioner] demonstrated that a joint trial of the substantive charge and enhancement allegation "'actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

*People v. Albarran* (2007) 149 Cal.App.4th 214, on which [Petitioner] relies, is distinguishable. On the facts of that case, the Court of Appeal concluded that the erroneous admission of gang evidence violated due process. (*Id.* at p. 232.) There, however, "the motive for the underlying crimes ... was not apparent from the circumstances of the crime." (*Id.* at p. 227.) Nothing inherent in the facts of the shooting suggested any specific gang motive; the only evidence to support the prosecution's claimed motive that the shooting was to gain respect, was the fact of the defendant's gang affiliation. (*Ibid.*) This was insufficient to counterbalance the "other extremely inflammatory gang evidence [that] was admitted, which had no connection to these crimes." (*Ibid.*) In short, much of the gang evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (*Id.* at p. 228.) Contrary to [Petitioner]'s rather selective view, the evidence presented here was quantitatively and qualitatively different from that before the court in *Albarran*.

One last observation is warranted. [Petitioner] cites *People v. Partida* (2005) 37 Cal.4th 428, 437 for the proposition that "[i]t is a violation of constitutional due process to erroneously introduce evidence of gang affiliation." *Partida* says no such thing. At issue in that case was "when, if ever, a trial objection on Evidence Code section 352 grounds preserves the appellate argument that admitting the evidence violated a defendant's federal due process rights and, if the argument is preserved, under what circumstances error of this natures does violate due process." (*Partida*, at p. 431.) At the page cited by [Petitioner], the opinion discusses when an objection under Evidence Code

16

section 352 is sufficient to preserve a due process argument for appeal. (*Partida,* at p. 437.) In fact, the California Supreme Court ultimately upheld the Court of Appeal's finding of *no* due process violation resulting from the erroneous admission of some of the challenged gang evidence. (*Id.* at p. 439.)

(See Lodged Doc. No. 4.)

As correctly argued by Respondent, there is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution.  In United States v. Lane, 474 U.S. 438, 446 n.8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  However, in Young v. Pliler, the Ninth Circuit noted:

> Lane considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

273 Fed.Appx. 670, n.1, 2008 WL 1757564 (9th Cir.2008) (unpublished).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief.

Even if the Supreme Court's footnote is considered clearly established Federal law, no constitutional violation occurred in this case.  As thoroughly discussed by the appellate court, the gang evidence was probative of motive.  Petitioner fails to demonstrate that the prejudicial effect of the evidence outweighed the probative value such that Petitioner was denied his Fifth Amendment right to a fair trial.

The state court adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or result in a decision that was based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). The claim should be rejected.

B.  Batson/Wheeler Claim

Petitioner next argues he was denied his right to equal protection by the prosecutor's use of a peremptory challenge to remove a Hispanic prospective juror based on a pretextual reason. This claim was also raised on direct appeal to the Fifth DCA where it was rejected in a reasoned decision. (See Lodged Doc. No. 4.)  The claim was then presented to the California Supreme Court where it was denied without comment.  As noted above, when the California Supreme Court is silent in its denial, a reviewing federal court must "look through" that decision to a court below that has issued a reasoned opinion.  Ylst, supra, 501 U.S. at 804-05 & n. 3.  Here, the Fifth DCA denied the claim as follows:

> [Petitioner], who is Hispanic, challenges the trial court's denial of his *Batson-Wheeler*[FN10] motion, which was brought as a result of the prosecutor's peremptory excusals of several prospective jurors who were Hispanic. Hispanics are a cognizable group for purposes of *Batson-Wheeler* analysis.[FN11] (*People v. Trevino* (1985) 39 Cal.3d 667, 686, disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221.)
>
> FN10. *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).
>
> FN11. A defendant and prospective jurors alleged to have been wrongly excused need not be members of the same race in order for the defendant to complain. (*Powers v. Ohio* (1991) 499 U.S. 400, 416.)
>
> "The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17-18.) Peremptory challenges may properly be used to remove prospective jurors believed to entertain specific bias, i.e., bias regarding the particular case on trial or the parties or witnesses thereto. (*Wheeler, supra,* 22 Cal.3d at p. 274.) However, "'[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias-that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"-violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 596; see *Batson, supra,* 476 U.S. at pp. 88-89; *Wheeler, supra,* 22 Cal.3d at pp. 276-277.)

"The United States Supreme Court has ... reaffirmed that *Batson* states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 541, quoting *Johnson v. California* (2005) 545 U.S. 162, 168.) The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (*People v. Bell, supra,* 40 Cal.4th at p. 596; *Wheeler, supra,* 22 Cal.3d at pp. 280-282.)

With these principles in mind, we turn to the facts of the case before us.

*A. Factual Background*

Prospective Juror Nos. 702817 and 715059-both of whom had Hispanic surnames-were among the first 18 individuals examined during voir dire. [FN12] In part, No. 702817 related that he was a supervisor at Ruiz Foods; was charged with murder in the early 1990's, but released due to lack of evidence, and harbored no animosity toward anyone but the Tulare Police Department; did not think Tulare County had a serious gang problem, but instead believed it was mainly junior-high-age youngsters and "the younger generation," and that it was a phase; and his wife's whole family were ex-Norteno members The prosecutor excused No. 702817 with his third peremptory challenge.

FN12. Hereafter, we refer to prospective jurors by their badge numbers.

No. 715059 related that he had been a bartender at the Depot Restaurant for approximately nine years; believed Tulare County had a gang problem, but had not experienced any of his coworkers claiming gang association or anything similar; and had had no contact with law enforcement from situations at the Depot, had never seen the police there except possibly pulling someone over, and had not seen fights in the parking lot or similar activity in the last few years. When asked whether he had been a victim of any kind of crime, he replied that he had had a girlfriend stolen once. When asked if he had seen anything happen at the Depot or been a victim there, he responded, "A lot of things happen at the Depot, but that's not a crime." The prosecutor excused No. 715059 with his fourth peremptory challenge.

No. 645963, who also had a Hispanic surname, was among the second panel called for voir dire. She related that she had a brother who had been in and out of jail for drug-related offenses, but felt he had been treated appropriately; had lived in Visalia all her life and was presently unemployed, but had previously been a receptionist at a day spa; and followed the news, reading the Visalia Times Delta daily and watching television news regularly in the morning and sometimes in the evening. The record does not reflect which peremptory challenge the prosecutor used to excuse this prospective juror, but the prosecutor exercised eight peremptory challenges against prospective jurors (not including alternates).[FN13]

FN13. The court reporter initially was unable to transcribe her notes of jury selection occurring on December 3, 2007, and the parties were directed to obtain a settled statement. The reporter's transcript for December 3, 2007, eventually was supplied, but it appears that the transcript of a portion of the proceedings is still missing.

Following the excusal of No. 645963, defense counsel raised a *Batson-Wheeler* claim. He argued that of the prosecutor's eight peremptory challenges, three had been exercised so as to exclude Hispanics, specifically Nos. 645963, 715059, and 702817. Counsel acknowledged that he could understand some concern with respect to No. 702817 because he was once charged with murder, but asserted there was no justification with respect to the other two. This ensued:

"THE COURT: Mr. Sliney [prosecutor] do you want to respond to that?

"MR. SLINEY: First off, ... is the court finding a prima facia [*sic*] indication?

"THE COURT: I'm not sure. Certainly there is a prime fascia [*sic*] group. I mean the Hispanics are ... a recognized group. My notes are that you have excused out of your eight peremptories four were used for Hispanics. So with that in mind I would like for you to just respond as to those four peremptories. [¶] ... [¶]

"MR. RUMERY [defense counsel]: Who was the fourth one? Maybe I missed that. I didn't get it down.

"MR. SLINEY: To be honest with you I don't have any idea but I can start with (Badge Number 645963).... Basically my concern ... is the fact that she was born and raised apparently in Visalia. Has been a lifer here. Went to school here. Doesn't think that gangs are-she said not a serious problem. She indicated that they were never a problem when she was in school.

"And she talked about a niece who had problems at school and indicated that the niece didn't relate-she kind of waffled on whether it was gang related but my concern is that she basically is sticking her head in the sand and doesn't recognize that these problems exist in Tulare County.

"(Badge Number 702817) I remember. Indicated that he had basically a lot of family members that were Nortenos in Dinuba. He worked at Ruiz Foods. One of our witnesses has worked at Ruiz Foods. Been fired from Ruiz Foods or left Ruiz Foods. I guess quit. Didn't indicate that he knew the witness after I stated the name.

"That was my largest concern was his gang ties. The fact that he said all his wife's family members were gang members yet he was not a gang member and the fact that he worked at Ruiz Foods and yet never mentioned he knew the person by the name of Joseph Acosta and my concern is that he did know Mr. Acosta and just didn't bring it up because ... apparently ... Mr. Acosta left Ruiz Foods because of some sort of conflict. [¶] ... [¶] ... (Badge Number 715059) because he worked at the Depot. There's been police activity at the Depot. We just had a case where there was a PC 69 case that went to trial for basically a big fight in the parking lot. Police chasing someone, all kinds of things.

"That and the fact that he just didn't seem to take the proceedings seriously. I don't think he was being honest with his years at the Depot. And there's no way he could have not known about the police activity with the PC 69 that took place in the parking lot. I think people were tazed. I don't know what department it went to trial in, but my concern is he just wasn't being truthful. [¶] ... [¶]

"MR. SLINEY: And the court has mentioned a fourth and I really have no idea who you're talking about.

"THE COURT: I don't recall it either.... [¶] ... [¶] ... Well at this point-

"MR. RUMERY: I think-

"THE COURT:-I'm not finding any systematic exclusion of Hispanics by-

"MR. RUMERY: Can I make a comment about what he said about (Badge Number 715059)? I think his reasoning ... is suspect because the questions that he's saying about police action at the Depot was never questioned of, of (Badge Number 715059).

"THE COURT: He did ask him.

"MR. RUMERY: He asked if he knew of any police action and he said no.... [¶] It could have been on a time when he was off on vacation. He could have not been working that day and for him to use that as an excuse is not correct, ... and like I said, three Hispanics ... have gotten past cause issues into the box and they've all been excused by the prosecution.

"THE COURT: Well, I would also say this, ... I agree with Mr. Sliney. (Badge Number 715059) did not seem to be taking things seriously. He seemed to have some type of attitude. Maybe he was nervous. Maybe he was somewhat intimidated. Maybe he was being evasive. Maybe he didn't take the matter seriously but he ... his responses seemed to the court odd. That's all I'll say so anything else you want to add Mr. Rumery?

"MR. RUMERY: No.

"THE COURT: Your motion is denied."

The prosecutor also exercised two peremptory challenges during selection of the alternate jurors. After the alternate jurors were sworn, defense counsel renewed his *Batson-Wheeler* motion, based on the prosecutor's challenge to No. 737748. The trial court denied the motion, observing: "[T]here are two Hispanics on the jury at this point. I believe (Badge Number 675026) and (Badge Number 622883). Certainly (Badge Number 737748) I believe ... it's understandable why the prosecutor might remove him. He was friends or family that knew, he knows gang members." [FN14]

FN14. The record reflects that two of the alternate jurors also had Hispanic surnames.

*B. Analysis* [FN15]

FN15. We do not separately address excusal of the prospective alternate juror. As the jury-including the alternates-had already been sworn and the remaining unselected prospective jurors dismissed, the renewed motion was untimely. (*People v. Roldan* (2005) 35 Cal.4th 646, 701, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. McDermott* (2002) 28 Cal.4th 946, 969-970.) We also do not discuss the prosecutor's purported challenge to a fourth Hispanic prospective juror, since no one was able to determine who that person was or even if the trial court's memory of such a person was correct.

The trial court expressed uncertainty as to whether it was finding a prima facie case of improper discrimination, step one of the *Batson-Wheeler* analysis. The issue need not detain us: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." ( *Hernandez v. New York* (1991) 500 U.S. 352, 359 (plur. opn.

of Kennedy, J.); *People v. Lewis* (2008) 43 Cal.4th 415, 471.) Accordingly, we proceed to step two.

At step two, the prosecutor must come forward with a race-neutral explanation for each challenged excusal. (*People v. Silva* (2001) 25 Cal.4th 345, 384.) "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.... [¶] A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez v. New York, supra,* 500 U.S. at pp. 359-360 (plur. opn. of Kennedy, J .).) At this step, the explanation need not be persuasive, or even plausible. (*Purkett v. Elem* (1995) 514 U.S. 765, 767-768.)

The prosecutor stated race-neutral reasons with respect to Nos. 645963 (lived in Visalia entire life and went to school there, but did not think gangs were a serious problem), 702817 (family members were Nortenos; worked at Ruiz Foods but never mentioned Acosta, who left there because of a conflict), and 715059 (not truthful regarding knowledge of police activity at the Depot; not taking proceedings seriously). Relying on *United States v. Bishop* (9th Cir.1992) 959 F.2d 820 (*Bishop*), [Petitioner] appears to contend that the prosecutor's use of residence with respect to No. 645963 was a pretext for race. *Bishop* is neither controlling nor apposite (see *People v. Williams* (1997) 16 Cal.4th 153, 190-191), and the extent to which it is still viable, in light of *Purkett v. Elem, supra,* 514 U.S. 765, is suspect (see *Boyde v. Brown* (9th Cir.2005) 404 F.3d 1159, 1171, fn. 10). In any event, in *Bishop* the prosecutor explained his challenge of an African-American prospective juror as based in part on the fact the prospective juror lived in a predominantly low-income, African-American neighborhood and accordingly was likely to believe police "'pick on black people.'" (*Bishop, supra,* 959 F.2d at p. 821.) Such was not the use to which the prosecutor in the present case put the fact of the prospective juror's residence in Visalia. Moreover, while finding the excuse before it did not constitute a race-neutral explanation for the strike (*id.* at pp. 821-822), Bishop stated: "This is not to say that residence *never* can constitute a legitimate reason for excluding a juror.... On the contrary: What matters is not *whether* but *how* residence is used. Where residence is utilized as a link connecting a specific juror to the facts of the case, a prosecutor's explanation based on residence could rebut the prima facie showing." (*Id.* at p. 826.) The prosecutor here did not run afoul of *Bishop.*

Accordingly, we move to step three. At this stage of the *Batson-Wheeler* analysis, the trial court must decide whether the opponent of the peremptory strike has proved purposeful racial discrimination by a preponderance of the evidence. (*Purkett v. Elem, supra,* 514 U.S. at p. 767; *People v. Hutchins* (2007) 147 Cal.App.4th 992, 997-998.) The persuasiveness of the proffered justification now becomes relevant (*Johnson v. California, supra,* 545 U.S. at p. 171), as implausible or fantastic justifications will often be found to be pretexts for purposeful discrimination (Purkett v. Elem, supra, 514 U.S. at p. 768). However, a prosecutor is presumed toe his or her peremptory challenges in a constitutional manner (*People v. Alvarez* (1996) 14 Cal.4th 155, 193; *Wheeler, supra,* 22 Cal.3d at p. 278), and the justification proffered for the particular excusal "need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 136; accord, *People v. Williams, supra,* 16 Cal.4th at p. 191.) "What is required are reasonably specific and neutral explanations that are related to the particular case being tried." (*People v. Johnson, supra,* 47 Cal.3d at p. 1218.)

Once the prosecutor "come[s] forward with an explanation that demonstrates a

neutral explanation related to the particular case tried" (*People v. Johnson, supra,* 47 Cal.3d at p. 1216), the trial court must then satisfy itself that the explanation is genuine (*People v. Hall* (1983) 35 Cal.3d 161, 167). "In [this] process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes*(1991) 54 Cal.3d 707, 720.) "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (*People v. Hall, supra,* 35 Cal.3d at pp. 167-168.) In undertaking this evaluation, the trial court need not make affirmative inquiries, but must find the race-neutral explanations to be credible. (*People v. Hamilton* (2009) 45 Cal.4th 863, 907.) "When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 104-105; accord, *People v. Lenix* (2008) 44 Cal.4th 602, 627.) Deference does not, of course, "imply abandonment or abdication of judicial review ." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 340.)

Substantial evidence supports the trial court's ruling as to each of the challenged prospective jurors. The prosecutor's stated reasons for excusing No. 702817 were both inherently plausible and supported by the record (see *People v. Panah* (2005) 35 Cal.4th 395, 442; *People v. Silva, supra,* 25 Cal.4th at p. 386); moreover, he was once charged with murder, although he professed to harbor no animosity toward the district attorney's office. The prosecutor's stated reasons for excusing No. 715059 were also inherently plausible and supported by the record. Even the trial court commented on the prospective juror's demeanor and felt he had some sort of attitude. As the trial court was in the best position to observe the prospective juror's demeanor, its implied finding that the prosecutor's reasons-including the demeanor-based one-were sincere and genuine, is entitled to great deference (*People v. Stanley* (2006) 39 Cal.4th 913, 939), and we see no reason to reject that finding.

We reach the same conclusion with respect to No. 645963. We have undertaken the requisite comparative analysis (see *People v. Lenix, supra,* 44 Cal.4th at pp. 607, 621-622); "[v]iewing such comparative evidence in light of the totality of evidence relevant on the claim, we conclude it does not demonstrate purposeful discrimination." (*People v. Cruz* (2008) 44 Cal.4th 636, 659.) [Petitioner] points to Nos. 623259 and 712429 as being non-minority jurors who were not challenged despite their opinion that there was not a serious gang problem in Tulare County. However, No. 645963 stated that she followed the news, reading the Visalia Times Delta daily and watching television news regularly at least once a day. In conjunction with his change of venue motion, defense counsel submitted numerous articles from the Visalia Times Delta that had to do with gangs. A number of other prospective jurors who believed Tulare County had a serious gang problem came to that conclusion at least in part based on what they read in the newspaper. No. 623259 did not read the local news, except sometimes the Fresno Bee's fishing column, and did not feel he had enough information to say whether Tulare County had a serious gang problem. No. 712429 read the Fresno Bee and watched local television news; she believed Tulare County had a gang problem, but that it was not as serious as Fresno's and law enforcement was doing a good job suppressing it. [Petitioner] has called to our attention no prospective juror who read the Visalia newspaper on a daily basis and yet did not think there was a significant or serious gang problem, and our review of the record shows none.

Finally, we note that two trial jurors, and two alternates, had Hispanic surnames. " 'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.' [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 203; accord, *People v. Lewis, supra,* 43 Cal.4th at p. 480.) Our review of the record as a whole demonstrates that substantial evidence supports the trial court's conclusion that the prosecutor's peremptory excusals of Nos. 645963, 702817, and 715059 were not motivated by discriminatory intent. (See *People v. Cruz, supra,* 44 Cal.4th at p. 661.) The *Batson-Wheeler* motion was properly denied.

(See Lodged Doc. No. 4.)

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., *quoting* Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, n.21.

In this case, the state court properly applied the Batson test in concluding there was no racial pretext in the prosecution's exercise of a peremptory strike to Prospective Juror No. 645963, a Hispanic female. The state court determined there was substantial evidence in the record to support the prosecutor's reasons for excluding the juror. The juror stated she was born

and raised in Visalia, and had attended school there. She stated she read the local newspaper daily and watched television news regularly. Nevertheless, she stated she did not believe gangs were a serious problem in the area, despite numerous newspaper articles produced by defense counsel which showed gangs were notorious in the area. The court also noted that several other jurors who came to the conclusion that gangs were a problem in the area did so based on reading the newspaper.

The state court also undertook a comparative analysis of other jurors who were not stricken from the venire. See Miller-El v. Dretke, 545 U.S. 231, 241 (2005) (Using comparative analysis as a tool to determine whether the prosecutor's race-neutral reasons were a pretext for race). The court noted that two non-Hispanic jurors had not been stricken despite stating they did not believe gangs were a serious problem in the area. Juror No. 623259 did not follow the news like the stricken juror, merely reading the fishing column occasionally. The juror essentially stated he did not have enough information to come to such conclusion. Juror No. 712429 did follow the news; however, she stated there was a gang problem but it was not as serious as Fresno County's. The state court noted that there were no jurors who were informed by reading the Visalia newspaper but did not think there was a significant or serious gang problem.

On direct review, the trial court's determination regarding the prosecutor's proffered reasons is entitled to "great deference," Batson, 476 U.S., at 98, n. 21, and "must be sustained unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477. On federal habeas review, "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and "demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, __ U.S. __, __, 131 S.Ct. 1305, 1307 (2011), quoting, Renico v. Lett, 559 U.S. __, __, 130 S.Ct. 1855, 1862 (2010). In this case, the state appellate court decision was plainly not unreasonable. The record did not reflect different treatment between comparably situated jurors.

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The claim should be denied.

C.  Mutual Combat Instruction

In his third and final claim, Petitioner contends he was denied due process when the trial court instructed on mutual combat and shifted the burden so as to eliminate Petitioner's right to self defense.  Petitioner raised this claim on direct appeal to the Fifth DCA, and it was also denied in a reasoned decision.  (See Lodged Doc. No. 4.)  He then presented the claim to the California Supreme Court where it was denied without comment.  Since the California Supreme Court was silent in its denial, this Court must "look through" to the decision of the appellate court.  Ylst, supra, 501 U.S. at 804-05 & n. 3.  The Fifth DCA rejected the claim as follows:

> Over defense objection that there was no mutual combat shown by the evidence, the trial court instructed, pursuant to CALCRIM No. 3471: "A person who engages in mutual combat or who is the first one to use physical force has a right to self-defense only if, one, he actually and in good faith tries to stop fighting. [¶] And two, he indicates by word or by conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight."

> CALCRIM No. 3471 correctly states the law as contained in section 197. [FN16] [Petitioner] did not ask the trial court to define mutual combat for the jury. (See People v. Miceli (1951) 101 Cal.App.2d 643, 649.) [FN17] Relying on People v. Ross (2007) 155 Cal.App.4th 1033 (Ross), however, he now contends the trial court erred in instructing on mutual combat since the case involved no prior agreement to fight, and that the error shifted the burden of proof and denied [Petitioner] due process by virtually eliminating the defenses of self-defense and imperfect self-defense.[FN18]

> FN16. Section 197 provides, in pertinent part: "Homicide is ... justifiable when committed by any person in any of the following cases: [¶] 3. When committed in the lawful defense of such person, ... when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, ... if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed...."

> FN17. As revised in 2008, CALCRIM No. 3471 now contains the following optional paragraph: "[A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose.]"

> FN18. Imperfect self-defense is not a true defense, but instead is a shorthand description of one form of voluntary manslaughter, a lesser included offense of murder. (People v. Rogers (2006) 39 Cal.4th 826, 883; People v. Mejia-Lenares (2006) 135 Cal.App.4th 1437, 1446.)

> In Ross, the defendant and a woman "engaged in a hostile verbal exchange, at the culmination of which she slapped him. Defendant responded with a blow that fractured her cheekbone." (Ross, supra, 155 Cal.App.4th at p. 1036.) He was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that a person charged with assault cannot successfully plead self-defense if he

was engaged in mutual combat with the alleged victim; and also refused the deliberating jurors' request for a legal definition of "mutual combat," telling them instead to rely on the ordinary meaning of those words. (*Ibid.*) As the appellate court explained: "This left the jury free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Ibid.*) Because the evidence was insufficient to establish any such arrangement or agreement and the jury could have found the defendant acted in self-defense when he struck the blow upon which the verdict was based, the appellate court found the error prejudicial. ( *Ibid.*)

In examining the meaning of "mutual combat," the *Ross* court observed: "Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecutor for assaulting the other. The 'combat' element of this rule is clear enough, at least for present purposes. It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City." (*Ross, supra,* 155 Cal.App.4th at p. 1043, fn. omitted.) The court found "mutual" to be troublesome, however, and the lay meaning of "mutual combat" "too broad to convey the correct legal principle." (*Id.* at p. 1044.) Thus, "[i]f A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as 'mutual combat' in the ordinary sense of those words. But as this example demonstrates, the phrase so understood may readily describe situations in which the law plainly grants one of the combatants a right of self-defense." (*Ibid.*) Accordingly, the court determined, "As used in the present context, the phrase 'mutual combat' is not only ambiguous but a misnomer. The mutuality triggering the doctrine inheres not in the combat but in the *preexisting intent to engage in it.* Old but intact caselaw confirms that as used in the state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. ...* [']Both before and since [the 1872 enactment of Penal Code section 197] the phrase "mutual combat" has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of *a duel or other fight begun or continued by mutual consent or agreement, express or implied.* [Citations.]' (Italics added.) In other words, it is not merely the *combat,* but the *preexisting intention to engage in it,* that must be mutual." (*Id.* at p. 1045, fn. omitted.) The court further stated: "We are satisfied that 'mutual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*" (*Id.* at pp. 1046-1047.)

The appellate court concluded there was insufficient evidence to support a finding that when the blows were exchanged, the defendant and alleged victim had formed the intent to engage in a fight. (*Ross, supra,* 155 Cal.App.4th at p. 1052.) "Instead the evidence strongly suggests that the parties exchanged contemptuous remarks until [the alleged victim] lost her temper and slapped defendant, whereupon he punched her back. This is not 'mutual combat' as that term as been explicated in California precedents." (*Id.* at p. 1054, fn. omitted.)

In assessing prejudice, the Court of Appeal rejected the notion that the error amounted to a failure to instruct on a defense theory and so required reversal unless shown to be harmless beyond a reasonable doubt. Instead, the court found the error to consist of the giving of an unwarranted and incomplete instruction on a prosecution

theory in rebuttal of the defense. Accordingly, the applicable standard was that set out in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson* ), viz., whether it was reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (*Ross, supra,* 155 Cal.App.4th at pp. 1054-1055.) In finding prejudice even under the more lenient standard, the court rejected the respondent's argument that the instruction was harmless because juries are said to ignore irrelevant instructions, stating: "Had the jury been properly instructed on the meaning of 'mutual combat,' and were the record otherwise silent on the subject, this supposition might obtain. A properly instructed jury would not find 'mutual combat' on the present facts, and would therefore presumably ignore the instruction. But the jury here was *not* properly instructed. It was left to suppose that the instruction might apply to *any* exchange of blows. Moreover the record affirmatively shows that jurors did not ignore the instruction. They petitioned the court in vain to clarify it. This fact turns respondent's generalization on its head: the very fact that jurors did not ignore the instruction suggests that they misunderstood it in precisely the way we have outlined, and thus misapplied it to improperly disqualify defendant from asserting a right to defend himself." (*Id.* at p. 1056.)

The present case differs from *Ross.* In *Ross,* the instruction at issue was CALJIC No. 5.56 (self-defense-participants in mutual combat). (*Ross, supra,* 155 Cal.App.4th at p. 1042, fn. 9.) This instruction deals solely and specifically with the right to self-defense of a person engaged in mutual combat.[FN19] By contrast, CALCRIM No. 3471 applies to both mutual combatants and initial aggressors. Fairly read, this instruction, by coupling a person who engages in mutual combat with one who is the first to use physical force, both deemphasizes the notion of mutual combat and links it to the use of physical force. Taking the instruction as a whole, and considering the arguments of the parties, we see no reasonable likelihood jurors interpreted the instruction to apply to a mere verbal altercation. (*Ross, supra,* 155 Cal.App.4th at p. 1043 "combat" suggests physical fight of some sort]; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [applying "reasonable likelihood" test to review of ambiguous instructions]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [same].) Significantly, [Petitioner]'s jury expressed no confusion or uncertainty about the meaning of "mutual combat."

FN19. *Ross* does not indicate whether CALJIC No. 5.54 (self-defense by an aggressor) was also given.

Moreover, we agree with respondent that, under one version of the evidence, an instruction on mutual combat was warranted. According to Perez, when Chavez's group left the bar, they started pushing people and saying things to [Petitioner] and Sauceda. Chavez's group was arguing about colors, and [Petitioner] and Sauceda argued back. The argument was about the colors red and blue; Perez knew the argument was basically about gangs. In our view, and contrary to the factual scenario that existed in *Ross,* an exchange of gang-related words under these circumstances permits a conclusion that the participants implicitly agreed and intended to fight. (See *Ross, supra,* 155 Cal.App.4th at pp. 1046-1047.)

Assuming the trial court should have modified CALCRIM No. 3471 to exclude any mention of mutual combat, however, any error was harmless. Under Acosta's version of events, Chavez's group kept saying they did not want any problems. Sauceda similarly testified that the person with whom [Petitioner] was arguing was saying he did not want any problems. According to Garcia, Chavez wanted to fight and was picking a fight. Sauceda tried to play peacemaker between Chavez's group and another group, and [Petitioner] went to defend Sauceda when Sauceda was surrounded and outnumbered. [Petitioner] was trying to get people not to fight. Chavez pushed [Petitioner], hard, multiple times, but [Petitioner] did not hit him. Jurors were told that some instructions might not apply and to follow those that applied to the facts as found by them; because,

under the foregoing versions of events jurors would not have found mutual combat even under the broad lay meaning thereof (see *Ross, supra,* 155 Cal.App.4th at p. 1044), we are satisfied they would have disregarded the reference to mutual combat. (See *People v. Rollo* (1977) 20 Cal.3d 109, 122-123 [erroneous giving of instruction that correctly states legal principle but has no application to facts of case usually harmless]; *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1348 [reviewing court could not conclude jury would have disregarded erroneous instruction because it fit within undisputed evidence offered at trial and was emphasized by prosecutor].) Under the circumstances, CALCRIM No. 3471 did not eliminate the jury's consideration of all evidence of self-defense or imperfect self-defense, or otherwise prejudice [Petitioner].

(See Lodged Doc. No. 4.)

The Supreme Court has held that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991), *citing* Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). Federal habeas courts therefore do not grant relief simply because an instruction may have been deficient. Estelle, 502 U.S. at 72. The only question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72; Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72, *quoting* Cupp v. Naughten, supra, 414 U.S., at 147. In addition, in reviewing the instruction, the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990). Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner's suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In this case, the state court properly concluded that no constitutional instructional error occurred. The challenged instruction, CALCRIM No. 3471, applies both to mutual combatants

1  and initial aggressors.  Under one version of the facts, an instruction on mutual combat was

2  warranted since Petitioner and the victim's group engaged in argument over gang colors and

3  gang words, and it could be concluded that the groups implicitly agreed and intended to fight.  If

4  this version of events was not believed, the jury was free to disregard the instruction.  Thus, the

5  instruction cannot be said to have "so infected the entire trial that the resulting conviction

6  violates due process." Cupp, 414 U.S. at 147.

7      In any case, the alleged instructional error did not have a substantial and injurious effect

8  on the verdict.  As noted by Respondent, the jury was instructed on self-defense and defense of

9  another, on the effect of provocation on the degree of murder, on heat-of-passion voluntary

10  manslaughter, and on imperfect self-defense. (See Lodged Doc. No. 31.)  The state court

11  reasonably concluded that CALCRIM No. 3471 did not deprive Petitioner of his defense or of the

12  jury's consideration of all of the evidence.

13      As with the previous claims, Petitioner has not demonstrated that the state court rejection

14  of his claim "resulted in a decision that was contrary to, or involved an unreasonable application

15  of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

16  U.S.C. § 2254(d). The claim should be denied.

17                                **RECOMMENDATION**

18      Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

19  PREJUDICE.

20      This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

21  United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

22  Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

23  California.  Within thirty (30) days after service of the Findings and Recommendation, any party

24  may file written objections with the court and serve a copy on all parties.  Such a document

25  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

26  to the objections shall be served and filed within fourteen (14) days after service of the

27  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

28  § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time

1  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

2  Cir. 1991).

3

4       IT IS SO ORDERED.

5  **Dated:   January 19, 2012            /s/ Gary S. Austin**
                                       UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28